McTAVISH v. GREEN.

1. USURY—USURY STATUTES STRICTLY CONSTRUED.

Usury statutes, being penal in character, must be strictly construed, and unless the statute takes away equitable rights, it follows that they remain.

2. SAME—EQUITY—ONE WHO COMES INTO EQUITY COURT MUST DO EQUITY.

In a suit to have a deed and contracts be declared a mortgage, and that such mortgage be held usurious, where the claim of usury is based on the first loans made, nearly 18 years before, which neither party regarded as usurious, and there is no claim of overreaching, oppression, or fraud, plaintiff will be required to do equity and pay the principal of the loans with legal interest.

Appeal from Chippewa; Fead (Louis H.), J.   Sub-

mitted May 3, 1922.    (Docket No. 85.)    Decided December 5, 1922.

Bill by James W. McTavish against Thomas J. Green, receiver of the Soo Mutual Savings & Loan Association, to have a deed declared a mortgage, and for an accounting. From the decree rendered, plaintiff appeals. Affirmed.

*McDonald & Kaltz* and *M. M. Larmonth,* for plaintiff.

*Warner & Sullivan,* for defendant.

Moore, J.   The bill of complaint was filed in this case in February, 1920. We quote sufficiently from the opinion of the chancellor to show what the litigation is about:

"In 1900 the plaintiff began to borrow money from the defendant.  Most of it was spent in purchasing and fitting up the Murray Hill hotel in Sault Ste. Marie.  The various loans were secured by mortgage on real estate and the pledge of stock certificates issued to plaintiff on the occasion of the loans.  The original obligation aggregated $64,000, including the loan of July 3, 1905, to Henry Barton, and which plaintiff assumed upon purchase of the premises covered thereby.  The first loan, $14,000 was dated June 23, 1900.  The second was dated January 15, 1901, but the obligations thereunder did not begin until later.  The third was dated September 20, 1901, and the others ranged from that time until July 3, 1905.

"Payments were made upon the loans from time to time by plaintiff but almost from the beginning he was in arrears in the contract amounts.  On April 3, 1907 the plaintiff gave a blanket mortgage in the sum of $60,000 covering all the property in and to take up all the various original loans.  At that time according to the computation of Miss Temple the total indebtedness was $63,674.51 and according to the

figures made by Mr. Dixon, an accountant, it was $74,293.61.

"The plaintiff did not make the contract payments as provided in the blanket mortgage and on March 17, 1909, the situation was again changed by the plaintiff and his wife executing to defendant a deed of the premises covered by the mortgage for the named consideration of $63,680.    On March 26, 1909, the defendant by two land contracts, agreed to sell and convey the property to Mina C. Martin, a sister-in-law of plaintiff.    One contract covered the home of plaintiff, known as the Court street property, for the consideration of $6,000.    The other covered the Murray Hill hotel and some residence property in Division and Oaka streets for a consideration of $58,347.87.

"On August 16, 1909, these contracts were assigned by Mrs. Martin to plaintiff.    On August 26, 1909, the defendant with plaintiff and his wife agreed in writing, indorsed upon the contracts, that with an advance of $175 made by defendant to plaintiff for repairs and improvements on the premises, the amount due on August 26, 1909, was $6,175 on the Court street contract; and with advances of $4,536.11 for repairs and improvements the amount due on the other contract was $62,883.98, allowance being made for $205.50 for interest paid by plaintiff.    The item of $4,536.11 was made up of advances on May 11th, $1,000; June 16th, $500; July 17th, $500, August 26th, $1,000 and accrued interest of $1,711.11 on both contracts from March 26th to August 26th, with a deduction of $175 applied on Exhibit M, the Court street contract.

"The plaintiff did not keep up the agreed payments on these contracts and another change was made.    On or about January 29, 1919, plaintiff executed to defendant a bill of sale of all the furniture and furnishings in the Murray Hill hotel while defendant deeded to plaintiff and his wife the Court street property. Plaintiff also delivered up possession of the Murray Hill hotel property to defendant on February 1, 1919. The disposition of the Division and Oaka street property will be considered later.

"Bill of Sale.    In this bill of complaint, plaintiff charges defendant with fraud and inducing him to

execute the bill of sale of the personalty used in the hotel. The fraud claimed is that defendant promised to credit him with the sum of $10,000 upon his indebtedness, to give him an additional credit when a hotel company, then being projected by plaintiff, several officers of defendant and others, to take over the Murray Hill hotel, was organized, and promised to release the Division and Oaka street properties to him. No mention is made in the bill, in connection with the charge of fraud, of the release to plaintiff of the Court street property.

"The hotel company seems to have been viewed by all the parties as a sort of Moses who would lead them to the Canaan of financial rest and plenty. For the purposes of promotion, an appraisal of the personal effects in the hotel was made at $24,298.87. The hotel was to be put into the deal at $90,000. The transaction was to effect a release of all other property of the plaintiff and to pay the defendant in full. The hopes engendered in the prospect of forming the company and disposing of the hotel undoubtedly had much influence upon the parties. Unfortunately the hotel company did not materialize and the parties had to continue to make bricks without straw. Lusty in 1918, the project was weak in January, 1919, and finally expired about March 1st.

"In his testimony, plaintiff states that the consideration of $10,000 was inserted in the bill of sale by J. R. Sutton, secretary and executive officer of defendant and with whom plaintiff had conducted most of his business with defendant. He did not know for what purpose. Nor does Sutton offer any lucid explanation. The inference I gather is that it was probably done under influence of that harmless hallucination sometimes met with, that it helps a subsequent sale to overstate a consideration. Plaintiff does not claim that he was actually promised by Sutton or any other officer of defendant a credit of $10,000 on his debt in exchange for the personalty. His first statement of the agreement is that Sutton, 'sometime before' the bill of sale was executed promised him that if he would sign the bill, defendant would give him a deed to the Court street property and 'when the hotel proposition was wound up,' would release the Division

and Oaka street properties. Sutton urged him to sign and said the balance of the deal would be fixed up in January. In January, he claims he had another conversation with Sutton in which the latter promised him the Court street property and a later release of the Division and Oaka street properties without condition. There was some $6,700 due upon the Court street property at the time. He states that the reason Sutton gave for not immediately releasing the Division street properties was that the defendant was prohibited by law from taking personal property in payment of a lien upon real estate. The reason could not have impressed him much in view of the immediate release of the Court street premises. Sutton explicitly denies the promise and the conversation in which plaintiff claims it was made. Shortly thereafter, plaintiff claims he reminded Sutton of the promise and asked its fulfillment, upon which he was told that the bill of sale had been recorded and there was nothing further to adjust. The board of directors approved the exchange on January 28th and the bill of sale was executed January 29th.

"In view of the direct conflict of testimony and the lack of corroborating witnesses, the relations of the parties and the surrounding circumstances become important. Without enumerating the details of their former transactions, I can find nothing, anywhere in the testimony, to indicate that the defendant or any of its officers had, at any time, tried to defraud or oppress plaintiff. Their attitude was always considerate and friendly. The harshest thing defendant had ever done was to urge plaintiff to reduce his indebtedness. It is not evidence of fraud for a creditor to ask his debtor for what is justly due nor to seek to get it. The plaintiff has conducted a large business for many years, the fact he was careless in his accounts carries no indication of lack of acumen, and there is nothing in the testimony which requires that he be placed in the position of a ward of the court. He had a right to make any bargain he desired, is bound by the bargain he made, and the court cannot set it aside without an affirmative showing that it was fraudulent.

"The question, of course, is not whether plaintiff made a good or bad bargain when he gave the bill of

sale.  Title to his home may have been worth more than the furniture, whatever its value.  It does not appear that the real value was ever talked over by the parties.  There is no claim by plaintiff that defendant promised to take the personalty at the prices mentioned in the Demar schedule.  Plaintiff, himself, considers the total too large.  The question is not what motives may have prompted plaintiff to make the exchange.  The question is whether plaintiff was promised a release of the Division and Oaka street properties, in addition to the Court street premises, in exchange for the personalty and whether that promise induced him to execute the bill of sale.

"Within a few days after plaintiff claims he was told by Sutton that the personal property transaction was closed and there was nothing further coming to him from it, he, in the presence of Miss Temple made a request of Sutton, later made a request to the board of directors of the defendant, and still later made a request of a committee appointed by the board of directors, Sutton being on the committee, that he be permitted to collect the rents from the Division and Oaka street properties to pay some of his outstanding bills, and made no claim that he had been promised a release of such properties in exchange for the personalty.  He made an offer to the board to pay $7,300 within sixty days, for the property and made no claim of a promise to release even when Sutton, at first expressing himself as favoring the offer, at once retracted and pointed out that defendant had to hold the properties to take care of any deficit arising after sale of the hotel.

"Plaintiff, through his prior dealings, knew that the final authority rested with the board of directors, yet he made no complaint that he had been defrauded or promised more than he had received, and he dealt with the board for the possession of the Division and Oaka street properties upon a different basis than that he was entitled to their release to him.  The only complaint he ever made is that, in talking with the committee, he expressed himself as dissatisfied with the amount of rent defendant had been paying for its offices and thought the personalty was worth more than the lien against the Court street property.

"The fact that he was granted permission to collect

the rents indicates that the board was friendly to him. And it does not appear reasonable that plaintiff, having had such a promise made to him by Sutton and then broken would immediately afterward deal with the board of directors upon the basis of offering to pay money to redeem and afterward would obtain permission to collect rents from the Division and Oaka street properties, without mentioning the promise and making at least some complaint at its non-fulfillment. In connection with the claim that the defendant was a 'one man concern,' i. e., Secretary Sutton, the appearance of the directors on the stand indicates that, while he was intrusted with the general management of the company, the directors had independent minds and would speak out if they suspected anything dishonest. The circumstances surrounding the transaction between the parties negative plaintiff's claim. As fraud must be affirmatively proved, it must be held that plaintiff has not sustained the burden of proof.

"The exchange of the personal property and the Court street premises must be left where the parties by their signed instruments in writing, have left it, as a closed transaction.

"Usury. Plaintiff asks that the deed and contracts of March, 1909 be declared a mortgage; that such mortgage be held usurious because he claims the original mortgages making up the aggregate loan were usurious and they tainted all subsequent transactions; and that he be allowed credit upon the principal sum for all premiums, fines and interest paid upon all the various instruments.    *    *    *

"The first loan, $14,000 was admittedly usurious because a premium was provided therein without observing the legal requirement of competitive bidding.    *    *    *    At the time the $60,000 mortgage was given to include all amounts due on all the original loans, the $14,000 mortgage had been reduced to $11,146.18, so that no part of the original usury became a part of the subsequent transactions. The same situation exists as to the second original loan if it was subject to the former statute requiring open competition.    *    *    *

"Surrender of Contract. At the time of the negotiations for possession of the properties in January,

1919, Mr. Sutton told plaintiff that the total indebtedness on both contracts was $97,383.01. Plaintiff claims that defendant took over the hotel at the stated sum of $80,000 and the personal property at $10,000 thus leaving a balance due against the Division and Oaka street premises of $7,383.01. He does not state with whom such stated sum was settled. Upon his offer to pay the balance of $7,383.01, he was informed that the defendant held the premises to protect any deficit after sale of the hotel. Plaintiff's claim does not agree with his claim that the personal property was transferred in consideration of both the Court street and the Division and Oaka street properties. Moreover, he asked for and obtained permission of the defendant to collect the rents of the latter properties. The preponderance of the testimony, aided by the conduct of the parties immediately after the transaction, supports the view that the hotel property was not taken over at any specified sum but that it was attempted to turn over and receive both properties for the whole debt covered by the contract, with a hope always being held out to plaintiff by defendant that a sufficient sum might be realized from a sale of the hotel to cause a further adjustment of the Division and Oaka street properties. The plaintiff was constantly impressed with the idea that the defendant wanted only the money due it, not the property. And while the hope may not have risen to the dignity of an enforcible agreement, it was much stressed.

"It is well settled that contract interests in real property cannot be surrendered by parol. *Stewart* v. *McLaughlin's Estate*, 126 Mich. 1; *Grunow* v. *Salter*, 118 Mich. 148; *McEwan* v. *Ortman*, 34 Mich. 325.

"It is undisputed that the plaintiff delivered actual possession of the hotel property, the defendant took charge February 1, 1919, has conducted the hotel since, has made some improvements upon the building, and defendant claims that plaintiff is estopped from denying the surrender of the whole premises by these facts and by his having agreed to turn over the Division and Oaka street properties and having attorned to defendant by obtaining permission to collect the rents.

"It is undisputed that no actual possession of the Division and Oaka street properties included in the same contract with the hotel, was ever given defend-

ant. The most it claims is constructive possession by reason of the facts above stated. Plaintiff, at all times had actual possession of the premises, installed tenants, collected rents, and made improvements. * * *

"As to the Division and Oaka street properties, there was no valid surrender of the interest of the plaintiff."

A decree was entered in which, among other provisions, it was decreed:

"The allegations of usury in said bill of complaint are not sustained by the evidence and the deed by plaintiff to defendant, dated March 17, 1909, * * * was valid instrument vesting the legal title to the lands therein described in the defendant.

"The land contracts described in said bill of complaint * * * were duly assigned by Mina C. Martin to plaintiff, and there was due on said contract, on the 26th day of August, 1909, from plaintiff to defendant the sum of $62,883.98.

"The allegations of fraud in the bill of complaint are not sustained by any evidence and the exchange of the personal property of the plaintiff in the Murray Hill hotel for his Court street property * * * was a valid transaction and should be affirmed.

"February 1, 1919, plaintiff surrendered to defendant possession of that part of the property described in said contract known as the Murray Hill hotel together with all right to any income therefrom and was relieved from all obligations in relation thereto.

"Plaintiff did not surrender possession of the balance of the property described in said contract referred to as the Division and Oaka street properties, and is entitled to the rents and profits therefrom and liable for the taxes and insurance premiums thereon in accordance with the terms of said contract.

"At the time of the surrender of the Murray Hill hotel to defendant, February 1, 1919, no sum was agreed upon as the amount to be credited plaintiff upon his contract on account of such surrender. The value of the property surrendered was $75,000, which should be credited upon the contract, as of that date.

"Title to the Murray Hill hotel is vested in said defendant free and clear of any and all claims of said plaintiff.

"Legal title to the other property described in said contract is vested in said defendant, subject to the contract right of plaintiff who has a right to a conveyance according to its terms upon payment within a reasonable time of the amount due thereon.

"There was due defendant from plaintiff February 1, 1919, on said contract for the purchase of the Division and Oaka street properties the sum of $89,442.73. On January 15, 1921, after deducting the value of the Murray Hill hotel as of February 1, 1919, there remained due and unpaid upon said contract the sum of $16,459.20.     *     *     *

"It is further ordered, adjudged and decreed that said plaintiff shall have thirty days in which to pay said defendant the amount found to be due upon said contract with interest at 7% from the 15th day of January, 1921, to the date of payment and upon such payment said defendant shall execute and deliver to said plaintiff its full covenant warranty deed of said premises in accordance with the terms of said contract and shall deliver possession thereof to said plaintiff."

It was further provided that if payment was not made the property should be sold. Counsel for defendant think the chancellor was wrong in decreeing that plaintiff might redeem the Division and Oaka street property but defendant has not appealed. The plaintiff brings the case here by appeal and discusses the issues involved under eight heads. The important questions are:

1. If the security instruments are usurious, or any of them, is plaintiff entitled to have credited to him on the principal of each, or all, the usurious charges under the usury statute?

2. Is plaintiff equitably entitled to the credit of the difference between the actual value of the personal property involved in the bill of sale of January 29, 1919, and the amount due on the Court street property at that time?

3. Is not plaintiff entitled to a credit for the value of the hotel real estate at the time of its surrender to the association at the figure represented by its own valuation at about that time?

4. Was the court justified in fixing the more or less arbitrary value of $75,000 on the hotel real estate and only allowing this credit on the alleged indebtedness?

We shall not undertake to discuss each of these questions in detail for reasons which will appear later.

If there were any usurious contracts made they were made in the years 1900 and 1901. It is clear that at that time no one thought they were usurious, and the parties continued to deal with each other until nearly the time when the bill of complaint was filed in this case, a period of about 18 years, no one claiming there was overreaching, oppression or fraud. The plaintiff has now come into a court of equity asking that his written contracts be set aside.

It may be well here to recall the language of Justice KUHN in *Vandervelde* v. *Wilson*, 176 Mich. 185, where he said:

"Usury statutes, being penal in character, must be strictly construed, and unless the statute takes away equitable rights it follows that they remain. He who asks equity must do equity. Webb, in his work on Usury (page 398), says:

"'But where the bill for relief against an usurious contract does not come strictly within the terms of the statute relieving the borrower of either paying or tendering interest in addition to the principal he will be governed by the general rule of law and compelled to pay or tender both principal and legal interest, for such statutes are construed strictly.'

"Complainant, in order to obtain relief in a court of equity against an attempt to collect usurious interest, must offer to pay the principal and legal interest, it being understood that this means the legal rate of interest fixed by the statute and not the rate provided for in the mortgage. * * *

"This court in the case of *Malone* v. *Danforth*, 137 Mich. 227, at page 231, in which it was sought to have

a deed and contract declared to be a mortgage and the contract rate of interest was usurious, said:

" 'The complainant, having appealed, protests against the allowance of interest on the moneys advanced, on the ground that the contract was usurious. This contention cannot prevail. The contract is not in its terms a mortgage. The complainant seeks to have a court of equity declare it such, and in asking aid, he should be prepared to do equity. The court below decreed simple interest and this order is affirmed.' "

See, also, *Dalton* v. *Weber,* 203 Mich. 455; *Legg* v. *Bower,* 212 Mich. 403.

Applying these principles to the instant case, we think the plaintiff should be required to do equity and if this is done the plaintiff has no reasonable ground for complaint.

The decree is affirmed, with costs to the defendant.

WIEST, MCDONALD, CLARK, BIRD, and SHARPE, JJ., concurred.

FELLOWS, C. J., concurred in the result. STEERE, J., did not sit.